United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 03-40220 MJJ |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS UNDER RFRA** |
| v. | |
| MOSES ADEYEMO, | |
| Defendant. | |

## INTRODUCTION

Defendant Moses Adeyemo ("Defendant") moves to dismiss the indictment under the Religious Freedom Restoration Act ("RFRA"). (Docket No. 11.) For the reasons set forth below, the Court **DENIES** Defendant's motion to dismiss.

## FACTUAL BACKGROUND

Defendant is a citizen of Nigeria and the United States of America. When Defendant travels to the United States, he stays for one to two months. He brings Nigerian wooden carvings and handicrafts that he gives as gifts and sells at different Bay Area flea markets. Only after he earns enough money doing odd jobs and selling wooden carvings and handicrafts can Defendant afford to buy a return ticket back to Nigeria. (Colby Decl. at ¶ 4-6.)

Defendant alleges to be an adherent of a mixture of the Catholic and Santeria religions. Defendant has submitted evidence to show that, in Nigeria, Catholicism is mixed with Santeria. Santeria is one of a number of Yoruba religions "practiced around the Atlantic perimeter that shares

historical roots in what is now Southwestern Nigeria, and is united in the worship of sacred beings called Orishas." (Matory Decl. at ¶ 2.) Leopard skins are an integral part of the Yoruba belief system. "The Leopard is associated with one of the primary Yoruba Orishas, known as Shango." (Doris Decl. at ¶ 4.)

In May 2001, a U.S. Customs inspector inspected a carton sent by Defendant from Nigeria. The shipping carton contained religious wall hangings. These wall hangings are Yoruba pouches described by Defendant to investigators as bringing "good health and strength" to those in need. (Garlick Investigative Report at 5.) The source of strength comes from the leopard skins that are sewn within each pouch. "It is common practice for a person to put the items associated with an Orisha into vessels associated with that Orisha . . . [these vessels] are often decorated on the outside with cowrie shells, which represent personal wealth and good fortune." (Doris Decl. at ¶ 6.) Defendant alleges that the pelts from these wall hangings were to be used as gifts in part of a religious celebration, not for sale. (Adeyemo Decl. at ¶ 5; Adeyemo Supp. Decl. at ¶¶ 2-5; Garlick Investigative Report at 5.)

The Government has charged Defendant with unlawfully importing and transporting leopard skins into the United States pursuant to the Endangered Species Act ("ESA"), the Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES") and the Lacey Act. On October 30, 2003, Defendant was charged by a grand jury with two counts:

> A. Smuggling the leopard skins into the United States contrary to law, specifically-
> (1) ESA, 16 U.S.C. § 1538(a)(1)(A), which prohibits the importation or interstate sale of endangered species, without an import permit issued by the U.S. Fish and Wildlife Service;
> (2) ESA, 16 U.S.C. § 1538(c)(1), which holds that it is unlawful to engage in any trade in, or to possess, any specimens contrary to the provisions of CITES; and
> (3) 19 C.F.R. § 145.11, which requires a Customs' declaration form giving a full and complete description of the contents and value of the merchandise shipped, in violation of 18 U.S.C. § 545; and
>
> B. Violating the Lacey Act, 16 U.S.C. §§ 3372(a)(1) and 3373(d)(2), for transporting the leopard skins in violation of ESA, 16 U.S.C. § 1538(c)(1).

Defendant seeks dismissal of the indictment under the Religious Freedom Restoration Act ("RFRA"). Defendant alleges that he has a sincere religious belief in the power of leopard skins and

2

1  that the Government's prosecution has imposed a substantial burden on the exercise of this belief.
2  Defendant further contends that the Government has not met its burden because it cannot show that
3  it has a compelling interest in enforcing these laws against Defendant, nor that such enforcement is
4  the least restrictive means to further any compelling interest.

5  After full briefing, the Court held oral argument on Defendant's motion. Because the record
6  had not been fully developed on several salient points, the Court permitted supplemental
7  declarations be submitted by both parties. Additionally, the Court ordered the parties to meet and
8  confer and attempt to come to agreement as to whether an evidentiary hearing was necessary to
9  resolve Defendant's motion. At a further hearing, the parties discussed their positions regarding an
10  evidentiary hearing and the supplemental declarations that had been submitted by the parties.

## LEGAL STANDARD

12  Rule of Criminal Procedure 12(b)(2) provides, "[a] party may raise a pre-trial motion any
13  defense, objection, or request that the court can determine without a trial of the general issue." Fed.
14  R. Crim. P. 12(b)(2). A charge in a complaint may be dismissed if it is subject to a defense that may
15  be decided solely on issues of law. *U.S. v. Tawahongva,* 456 F. Supp. 2d 1120, 1125 (D. Ariz.
16  2006). The Federal Rules of Criminal Procedure "clearly envision that a district court may make
17  preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so
18  long as the court's findings on the motion do not invade the province of the ultimate finder of facts."
19  *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1997).

## ANALYSIS

**I. Defendant Has Standing To Challenge The Indictment Under RFRA.**

22  Under RFRA, Defendant need only satisfy general Article III "case or controversy"
23  requirements to have standing to assert RFRA as a defense. Under 42 U.S.C. § 2000bb-1(c):

> A person whose religious exercise has been burdened in violation of
> this section may assert that violation as a claim or defense in a judicial
> proceeding and obtain appropriate relief against a government.
> ***Standing to assert a claim or defense under this section shall be
> governed by the general rules of standing under article III of the
> Constitution.***

28  (Emphasis added.) The Government does not assert that there is no Article III "case or controversy"

3

here, nor could it.

Instead, the Government asserts that Defendant lacks standing to challenge the ESA/CITES permit system here because he never applied for a permit. The Court disagrees. Where a person is ineligible for a permit under an existing permit system, or where it would have been futile to apply for a permit, that person need not apply for a permit to bring a RFRA challenge. *See U.S. v Antoine*, 318 F.3d 919, 922 n.4 (9th Cir. 2003) ("Because Antoine is ineligible, he need not apply for a permit in order to challenge the permit scheme."); *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) ("Desert and OMG also have standing to challenge the permit requirement, even though they did not apply for permits, because applying for a permit would have been futile."); *United States v. Hardman*, 297 F.3d 1116, 1120-21 (10th Cir. 2002) (en banc) ("Several courts have addressed this question, finding that, where an individual never actually applied for a permit, he cannot thereafter complain that the permitting process harmed his constitutional rights. When, however, it would have been futile for a claimant to apply for a benefit, courts have not denied the claimant standing because of his failure to apply.") (citations omitted).

Here, there is no dispute that it would have been futile for Defendant to apply for a permit, because there is no religious-permit process for importing or possessing leopard skins. The Government does not contend that the leopard skins imported by Defendant could have qualified for a permit under CITES Appendix-1 or either carveout identified by the parties: an exception for leopard skins obtained prior to 1972, and an exception for a leopard skin that Defendant himself sport-hunted in Southern Africa. The Government does not contest that Defendant would have therefore been denied a permit, had he applied for one. Accordingly, it would have been futile for Defendant to seek a permit, and the Court will not deny Defendant standing on that basis.

Neither of the two cases discussing RFRA upon which the Government relies establishes that Defendant lacks standing on the facts of this case. To the contrary, both are distinguishable. In *United States v. Hugs*, 109 F.3d 1375 (9th Cir. 1997), the defendants had never applied for or obtained a permit to take, possess, or transport certain types of eagle parts. *Hugs* found that the defendants lacked standing to challenge the eagle parts permitting system where they asserted not that they were unable to qualify for the type of permit in question, but that, even though they

4

qualified, the permit system was unduly burdensome in practice because it operated too slowly. *See id.* at 1378. Similarly, in *United States v. Tawahongva*, 465 F. Supp. 2d 1120 (D. Ariz. 2006), the court denied standing where the defendant had never applied for the relevant permit, and argued not that the permit system absolutely prohibited him from legally acquiring eagles, but that the administration of the permit system was unduly burdensome because it discomfited him to deal with the tribal government. *See id.* at 1128. In *Hugs* and *Tawahongva*, unlike here, applying for the relevant permit would not have been a futile act.[1]

Accordingly, the Court finds that Defendant has standing to bring a RFRA challenge to the counts in the indictment.

**II. Analysis Under The Religious Freedom Restoration Act ("RFRA").**

This Court must determine whether Defendant is exempt from prosecution for possessing and transporting leopard skins under the Religious Freedom Restoration Act ("RFRA"). The statute provides that the "[g]overnment may substantially burden a person's free exercise of religion only if it demonstrates that application of the burden to the person-(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b). "To establish a prima facie case, [Defendant] must show that the statute at issue works a substantial burden on his ability to freely practice his religion." *Guam v. Guerrero*, 290 F. 3d 1210, 1222 (9th Cir. 2002) (citing *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001)). If Defendant establishes that the prosecution substantially burdens his free exercise of religion, the burden shifts to the Government to establish that prosecuting Defendant is the least restrictive means of furthering a compelling government interest. *See United States v. Tawahongva*, 456 F. Supp.2d 1120, 1131 (D. Ariz. 2006). If the law does create a substantial burden, the Court may still uphold it if it serves a compelling government interest in the least restrictive manner possible. *See Guerrero,* 290 F. 3d at 1222.

///

---

[1] The Court also rejects the Government's argument, largely premised on *Tawahongva,* that standing restrictions require Defendant to meet the standard for facial unconstitutionality that is applied in classic First Amendment jurisprudence. *Tawahongva* does not stand for this proposition. Indeed, after *Tawahongva* rejected the defendant's constitutional free exercise claim because it did not meet the facial unconstitutionality standard, *Tawahongva* proceeded to consider and resolve the defendant's separate RFRA claim on the merits. *See Tawahongva*, 456 F. Supp. 2d at 1129-37.

**A.  Defendant's Burden Under RFRA.**

    **1.  An Evidentiary Hearing Would Be Necessary To Resolve The Sincerity Of Defendant's Alleged Religious Beliefs.**

Defendant provides evidence to demonstrate that his desire to possess leopard skins arises from a sincere religious belief. Here, Defendant identifies the specific religion to which he claims to adhere as a mixture of the Yoruba religions and Catholicism. (Adeyemo Decl. at ¶ 2.) Defendant's sworn declarations include an explanation that he believes in the power of the Orisha known as Shango, and that he was intending to use all of the seized leopard skins for a religious initiation ceremony. (Adeyemo Decl. at ¶¶ 3, 5; Adeyemo Supp. Decl. at ¶¶ 2-5.) Additionally, Defendant provides declarations from experts demonstrating how his possession and intended use of leopard skins arises from the Yoruba religion. (Matory Decl. at ¶¶ 4-7; Doris Decl. at ¶¶ 3-7.) Defendant's submitted evidence, if considered alone, would constitute a sufficient *prima facie* showing with respect to the sincerity of his religious beliefs.

However, evidence submitted by the Government squarely puts the credibility of Defendant's testimony about his religious beliefs at issue. The Government asserts that Defendant has manufactured a belief in the Yoruba religion in an attempt to dismiss the criminal charges against him, and introduces at least two pieces of evidence that call Defendant's credibility into question. First, the Government offers evidence that Defendant stated to investigators that he was Catholic, and that he believed in Jesus Christ, when he met with the USFWS inspector to clear the shipment. *(*Colby Decl. at ¶ 8.) Second, the Government introduces evidence of statements by Defendant's purported friend, Yagbe Onilu. Accordingly to the Government's investigating agent, Onilu stated "that it was his impression and belief from observing [Defendant], that [Defendant] despised the Santeria religion. Onilu stated that [Defendant] did sell African items to individuals in the United States who practiced the Santeria religion but as soon as the sale was over, [Defendant] physically moved away from these individuals to the other side of the room because he disliked the faith." (Colby Decl. at ¶ 15.) Onilu also stated to investigators that he had studied the Santeria religion, but that when he had stayed with Defendant and his family at his house in Nigeria, Defendant did not practice the Santeria religion nor a mixture of the Catholic and Santeria religion,

6

but instead performed only Catholic services in his house. (Colby Decl. at ¶ 13.)

The Government's evidence calls into question the credibility of Defendant's testimony that he has a sincere religious belief in the Santeria religion. This Court finds that it cannot determine whether Defendant has a sincere belief in the Santeria religion without holding an evidentiary hearing to assess credibility issues.[2]

### 2. An Evidentiary Hearing Would Be Necessary To Resolve Whether Laws Criminalizing Transportation, Importation, and Possession of Leopard Skins Substantially Burden Defendant's Free Exercise of Religion.

Defendant submits evidence that laws criminalizing the transportation, importation, and possession of leopard skins substantially burden his free exercise of religion while inside the United States. *See Guerrero,* 290 F. 3d at 1222. Defendant's declarations state that the leopard skins he had shipped to the United States were to be used by Defendant for "initiation and related celebrations." (Adeyemo Decl. at ¶ 5.) Defendant explained how he would use the leopard skins in such religious ceremonies: "I would identify those initiates chosen by the Babalawo as suitable candidates to receive Shango as their Orisha . . . Although I would only wear one leopard skin, the use of the other three leopard skins by initiates, with my instruction, is part of my celebration of the Bembe and has religious rewards for me." (Adeyemo Supp. Decl. ¶¶ 2-5.) Defendant also submits expert testimony indicating that his religious beliefs are centered around the Orisha, Shango, where possession of a leopard skin is considered "common practice." (Doris Decl. at ¶¶ 3-6.) He further submits expert testimony that "a leopard skin or pelt, or some other representative part of the leopard such as a tooth or paw, is sacred and an important symbol." (Matory Decl. at ¶ 7.) This evidence, if considered alone, would constitute a sufficient *prima facie* case that laws criminalizing the transportation, importation, and possession of leopard skins substantially burden Defendant's ability

---

[2] As discussed below, however, the need for an evidentiary hearing on this issue is rendered moot by the Government's showing that enforcement of the criminal statutes at issue here is the least restrictive means of furthering a compelling government interest. Because the Government's ability to meet that burden requires denial of the Motion, the Court need not hold an evidentiary hearing to resolve whether Defendant can meet his initial burden under RFRA.

1  to freely practice his religion while he is in the United States.[3]

2  However, once again, evidence submitted by the Government calls Defendant's credibility
3  into question on this issue. The Government offers evidence that Defendant initially denied
4  knowledge of all but one of the leopard pelts when first contacted about them by customs agents.
5  "Adeyemo admitted to the [special agents] that he knew that one of the hangings had a leopard skin
6  in it, but didn't know about the rest." (Garlick Investigate Report at 5.) This statement to the agent,
7  if accurate, cannot be resolved with Defendant's later testimony that he planned to use all four pelts
8  in a religious ceremony while in the United States (Adeyemo Supp. Decl. at ¶¶ 2-5); if he did not
9  even know about the second, third, and fourth leopard pelts, he could not have intended to use them
10 for religious purposes. Therefore, because Defendant's credibility is at issue with respect to whether
11 his free practice of religion is substantially burdened, this Court finds that it cannot determine
12 whether Defendant has satisfied the second component of his burden without holding an evidentiary
13 hearing.[4]

### 3. Defendant Has Not Shown That Laws Requiring Him To Declare Goods With Customs Substantially Burden His Free Exercise of Religion.

16 With respect to the portion of the indictment alleging that Defendant failed to declare the
17 leopard pelts when importing them as required by 19 C.F.R. § 145.11, the Court concludes that
18 Defendant has not shown that the free exercise of his religion has been substantially burdened by
19 this law of general applicability. *See* 42 U.S.C. § 2000bb-1. The Government correctly asserts that
20 "[Defendant] states no reason why he could not declare the leopard skins on a USFWS declaration
21 form as required by law." (Opp. at 18.) Although Defendant argues in his brief that he does not
22 have access to leopard pelts in the United States, the burden of declaring them is not discussed in

---

[3] *See Guam v. Guerrero*, 290 F. 3d 1210, 1222 (9th Cir. 2002) (finding that the criminalization of the possession of marijuana forced the defendant to choose between criminal prosecution and practicing his religion). Unlike in *Guerrero,* Defendant here also makes a *prima facie* showing that laws prohibiting importation of leopard skins substantially burdens his practice of religion. Because leopards are not native to the United States, Defendant must import and transport a leopard skin into the United States in order to possess it for religious purposes. *Cf. Guerrrero*, 290 F. 3d at 1223 (holding that RFRA did not provide a defense to importation of controlled substance charge because Rastafarianism, although requiring possession, did not require importation)

[4] Again, the need for an evidentiary hearing on this issue is rendered moot by the Government's showing that enforcement of the criminal statutes is the least restrictive means of furthering a compelling government interest.

8

any of the declarations he submits to this Court. The Court cannot infer a substantial burden caused the requirement that he declare the leopard skins merely from Defendant's overall arguments. Defendant has not demonstrated that, on this particular trip, the act of declaring his leopard skins imposed any burden, let alone a substantial burden, on the free exercise of his religion. Accordingly, the Court will deny the motion to dismiss as to this portion of the indictment.[5]

**B.    The Government's Burden Under RFRA.**

Although an evidentiary hearing would be required to resolve whether Defendant can meet his initial burden, the Court will nonetheless turn to the Government's burden under RFRA to examine whether grounds exist for denying the motion outright without the need for such a hearing. Using the standard set by the Religious Freedom Restoration Act, "a law of general applicability that substantially burdens the free exercise of religion is invalid unless the government demonstrates that the law is the least restrictive means of vindicating a compelling government interest." *See* 42 U.S.C. § 20000bb-1. The Court now examines whether the Government can satisfy this burden with respect to the laws criminalizing the transportation, importation, and possession of leopard skins under which Defendant is charged.

**1.    The Government Has Demonstrated The Conservation Of Endangered Leopards Is A Compelling Government Interest.**

The Government argues that the enforcement of laws criminalizing the transportation, importation, and possession of leopard skins furthers a compelling government interest in conserving and protecting endangered leopard species.[6] "Whether a proffered government interest qualifies as a compelling interest is a question of law." *United States v. Tawahongva*, F. Supp. 2d 1120, 1132 (D. Ariz. 2006) (citing *United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002)).

---

[5] Because Defendant has failed to meet his initial burden with respect to the declaration requirement, the Government need not demonstrate that enforcement of this law is the least restrictive means of furthering a compelling government interest.

[6] The government also asserts several additional compelling interests, including honoring treaty obligations, controlling borders, maintaining a balanced ecosystem, and fostering stability and safety in the U.S. and abroad. Because the Court ultimately finds that the Motion must be denied based on the Government's compelling interest in protecting endangered leopards, the Court does not reach whether these additional interests would independently warrant denial of the motion.

9

The Government has met its burden of demonstrating that the conservation and protection of endangered leopard species is a compelling government interest. In *TVA v. Hill*, 437 U.S. 153 (1978), the Supreme Court observed that "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording [the conservation of] endangered species the highest of priorities. . . ." *Id.* at 194. The legislative history of the Endangered Species Act ("ESA") further supports the Government's contention that protecting an endangered species from extinction is a compelling interest:

> it is in the best interest of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.

H.R. Rep. No. 93-412, ¶. 4-5 (1973); *see also TVA*, 437 U.S. at 174 ("[t]he legislative proceedings in 1973 are, in fact, replete with expressions of concern over the risk that might lie in the loss of *any* endangered species." )

As recognized by Appendix-I of CITES, leopards found north of the demarcation line in Africa, including Nigeria, are classified as endangered. Leopards found south of the demarcation line are classified as threatened. (Van Norman Decl. at ¶ 5.)   The Government has submitted persuasive evidence that leopard populations in northern Africa have decreased vastly due to poaching and loss habitat because of human population growth. (Henry Decl. at ¶ 5; *see also* Docket No. 37, Attach. B at 77-80.)  The Government has further demonstrated that the lucrative trade in leopard skins and other parts, used for religious, cultural, medicinal or collection purposes, is a major conservation concern and is compounding the threats to this already imperiled species. (Henry Decl. at ¶ 5.)

Defendant does not submit any evidence contradicting the thorough showing submitted by the Government on this point, and does not seriously contest that the Government's interest in ensuring the survival of an endangered leopard species is a compelling interest. Indeed, Defendant concedes that "the protection of threatened or endangered animal species is a laudable and important governmental interest." (Motion at 8.)

On this record, the Court is persuaded that the protection and conservation of endangered

leopards is a compelling interest.[7]

## 2. The Government Has Demonstrated That A Permitting Scheme Without A Religious Exemption Is The Least Restrictive Means for Conserving And Protecting Endangered Leopards.

Defendant argues that, as compared to the current permitting system for leopard skins which contains no religious exemption, a less restrictive alternative would be for the government to allow a religious exemption to the smuggling laws for leopard pelts. The Government disagrees, contending that allowing a religious exemption for leopard pelts would undermine the Government's ability to further its compelling interest in protecting endangered leopards. Having examined the record submitted by the parties, the Court concludes that the Government has met its burden of demonstrating that a permitting scheme without a religious exemption is the least restrictive means of furthering its compelling interest.

### a. The Current Permitting Scheme For Leopard Pelts Has Strict Requirements And Contains No Religious Exemption.

In order to bring a CITES Appendix-1 species, including a leopard or its parts, into the United States from Nigeria, an individual is required to obtain both an export permit from Nigeria and an import permit from the United States. (Van Norman Decl. at ¶ 8.) The Government's Chief of The Branch of Permits ("BOP"), Division of Management Authority ("DMA"), USFWS explains:

> the import of a leopard specimen into the United States, be it a live animal, blood samples, sport-hunted trophy, a skin or other type of specimen, the importer must comply with all requirements governing the import of a specimen of an Appendix-I species and must obtain the authorization under the ESA to carry out the otherwise prohibited import activity.

(Van Norman Decl. at ¶ 5.)

Under the ESA, in order to import into the United States any wildlife listed as endangered, it is necessary to have a permit authorizing the activity, or sufficient evidence that the

---

[7] Other courts have similarly held. For example, "[D]istrict Courts in [the Ninth Circuit] have . . . found a compelling interest in protecting eagles as a threatened or endangered species." *United States v. Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997) (finding the enforcement of the Bald and Golden Eagle Protection Act was the least restrictive means of serving a compelling government interest despite imposing a substantial burden on the practice of Native American religions); *see also Lundquist*, 932 F. Supp. 1237, 1241 (D. Or. 1996); *United States v. Jim*, 888 F. Supp. 1058, 1063 (D. Or. 1995).

11

wildlife qualifies as "Pre-Act," i.e., wildlife that was held in captivity or a controlled environment as of December 28, 1973, and is not held in the course of commercial activity. (Dean Decl. at ¶ 7.) For endangered leopards, permits can be issued only for scientific purposes, for propagation and survival of the species, or for the incidental taking of the species, where the proposed activity, besides meeting the other issuance criteria established in 50 C.F.R. § 17.22(a)(2), would likely reduce the threat of extinction facing the species. (Van Norman Decl. at ¶ 4.) As applied to Defendant in 2001, CITES and ESA did not have specific exemptions that would have allowed Defendant to legally import his leopard specimens into the United States.[8]

The current permitting scheme with respect to CITES and ESA-listed species is designed to allow for efficient review of whether the exporting country has issued a valid authorization for the export of the specimen, including whether it has been determined not to be a detriment to the species as a whole. It also allows for the collection of information regarding the extent of trade in the species for future policy planning. It further allows for an efficient determination of whether that specimen is exempt from ESA coverage. (Dean Decl. at ¶¶ 5-8.)

### b. A Permitting Scheme With A Religious Exemption Would Not Allow The Government To Safeguard Its Compelling Interest In Protecting Endangered Leopards.

To evaluate whether the Government has met its burden, the Court must examine whether the Government's established compelling interest – protecting endangered leopards – could still be safeguarded if a religious exception for adherents to the Santeria religion were allowed.[9] On this record, in which the Government has submitted several detailed declarations and other supporting

---

[8] Because the origin of the leopard skins at issue is unknown, the CITES approval process for sport-hunted leopard trophies obtained from southern Africa would not apply to Defendant in this case. (Van Norman Decl. at ¶ 8.)

[9] In arguing that the current permit system is the least restrictive means to further its compelling interests, the Government initially draws a comparison to permit systems at issue in two Native American cases, *U.S. v. Hugs*, 109 F.3d 1375 (9th Cir. 1997) and *U.S. v. Tawahongva*, 465 F. Supp. 2d 1120 (D. Ariz. 2006). However, the Court finds that neither case is directly analogous. Both cases involved wildlife protection statutes that incorporated administrative permit procedures specifically and explicitly allowing Native Americans to possess otherwise prohibited birds for religious purposes. *See Hugs*, 109 F.3d at 1377; *Tawahongva*, 456 F.Supp. 2d at 1129. In both cases, the court found that the Government's prosecution of the defendant satisfied the least restrictive means requirement under RFRA based on the religious permit system in place for defendant's use. Here, in contrast, no religious permitting system is in place for adherents to the Santeria religion. This Court must engage in a more detailed examination of whether an alternative less restrictive permitting system could be employed by the Government to protect its compelling interest.

12

1 materials, the Court finds that the Government has adequately demonstrated that granting a religious
2 exception to Defendant and those similarly situated would result in the compromised ability of the
3 Government to safeguard the conservation and survival of endangered leopards, ultimately
4 negatively impacting the survival of the species in northern Africa.

5 First, the Government has amply demonstrated that the leopards in Nigeria and other parts of
6 northern Africa,[10] due to their endangered status, face threats to their survival that are serious enough
7 that the take of even one endangered leopard for purposes of acquiring a pelt represents a
8 detrimental impact on the entire species. (Dean Decl. at ¶ 15.) The leopard species listed on
9 Appendix-I of CITES are threatened with extinction, and trade in specimens of these species can be
10 tolerated only in exceptional circumstances. (Hoover Decl. at ¶ 3.) The state of the northern African
11 leopard's existence is such that importation for reasons other than propagation enhancement or
12 scientific purposes would threaten their survival. (Van Norman Decl. at ¶ 4.)

13 Against this backdrop, the Government has also adequately demonstrated that it is more
14 likely than not that, were a religious exemption in place, the northern African leopard population
15 would not be able to sustain the increased traffic in leopard pelts attributable merely to those that
16 have a sincere religious belief in the Santeria religion. Defendant concedes that as of 2001, there
17 were approximately 22,000 people living in the United States alone who identified themselves as
18 adherents of Santeria. (Adeyemo Motion at 7.) The number of adherents that could potentially
19 demand use of a leopard skin for religious purposes in the United States far exceeds what the current
20 population of endangered leopards can sustain. (Dean Decl. at ¶ 15.) The impact of exempting all
21 sincere adherents of Yoruba religions that worship the Orisha Shango from the regulatory
22 procedures of ESA/CITES would be disastrous to the already small number of leopards that exist.
23 Even if the exception was used by only those with a sincere religious belief, it would not take many
24 religious practitioners to render endangered leopard species extinct. (Hunter Decl. at ¶ 7; Dean
25 Decl. at ¶ 15.)

---

[10] Individuals like the Defendant in this case, who fail to indicate the origin of the leopard skins, present a challenge to the Government in their attempts to further the interest of protecting the leopards of Africa that are classified as endangered. Without information regarding the specific origin of the species, the Government can legitimately treat the leopard pelts as originating from the northern Africa to ensure that the compelling interest in protecting the endangered northern African species is achieved.

United States District Court
For the Northern District of California

Additionally, the Government has shown that the impact of a religious exemption would extend beyond the increased trafficking in leopard pelts attributable to those with sincere religious beliefs in the Santeria religion. The Government's evidentiary submission demonstrates that any religious exemption would cause additional enforcement difficulties which in turn would undermine efforts to protect the endangered leopards in northern Africa. An exemption for religious purposes would require the under-resourced agencies responsible for monitoring trade to make an additional determination of whether the exemption is validly claimed. (Dean Decl. at ¶ 9.) Any religious exemption would require USFWS to allocate resources to investigate and research the legitimacy of such requests. Yet as the Government persuasively points out, "it would be almost impossible to successfully challenge or deny any claim of religious purpose" as a practical matter given the breadth of religions and religious groups. (Dean Decl. at ¶¶ 12,16; Henry Decl. at ¶¶ 6, 7). Therefore, an exemption would likely cause a spike in both legitimate and illegitimate applications for the skins of endangered leopards, threatening the extinction of the species. (Dean Decl. at ¶ 13.)

The Government has also shown that a religious exception would increase opportunities for financial gain in the trade of leopards, which would threaten the survival of the leopard population in northern Africa. The high price tag hanging over the head of each leopard is indicative of the uphill battle for survival that endangered leopards face. (Dean Decl. at ¶ 9.) The profit potential along with the low risk of detection, due to under-resourced enforcement agencies, combines to create a strong incentive to traffic in leopards, their parts and products produced there from. (Dean Decl. at ¶ 9.) The Government demonstrates that the lucrative trade in leopard skins and other parts, used for religious, cultural, medicinal or collection purposes, is a major conservation concern. (Henry Decl. at ¶ 5.)  "A leopard skin can range anywhere from $3,300 to $16,000, depending on the particular subspecies and the quality of the skin." (Dean Decl. at ¶ 9.) Because of the difficulty in deciphering between a person with a legitimate religious belief and a person who has manufactured a religious belief in an attempt to sell leopard skins, "[a]ny exemption for the importation of endangered species would invite fraud by creating new avenues for people to engage in the take, possession and trade of leopards." (Dean Decl. at ¶¶ 12-14). The Government has therefore adequately demonstrated that "[a]llowing a religious exemption to CITES and ESA-listed species sets a dangerous precedent and

creates a legal loophole for wildlife traffickers." (Henry Decl. at ¶ 6.)

The evidence submitted by the Government also demonstrates that unilaterally recognizing a religious exemption to CITES, which as it stands is only an international promise between countries, would more likely than not open the doors to corrupting influences of national administrations which pose a serious threat to wildlife through poaching and illegal trade. Were the United States to unilaterally recognize an exemption, it would encourage other nations to manipulate the systems that are in place to protect endangered species. (Sellar Decl. at ¶ 8.) An exemption for religious purposes recognized by the United States has the potential to thwart efforts to discourage illegal trade in member countries who have been suspended from trade, and encourage compliant countries to loosen their standards. (Sellar Decl. at ¶ 9.) This weakening of international protections would also have a detrimental effect on the survival of endangered leopard species.

Defendant has offered no evidence to counter the Government's showing. Instead, Defendant has raised several arguments as to why the Government's showing is insufficient. None of the arguments raised by Defendant persuade the Court that the Government has failed to carry its burden on this record.

First, Defendant contends that the pressure on endangered leopards created by use of pelts in religious ceremonies pales in comparison to other pressures that threaten the leopard's existence. The Court finds that the record does not support this argument. To begin with, the record reflects a link between the demand for leopard pelts used for religious purposes and the poaching of leopard skins to supply the demand. (Henry Decl. at ¶ 5.) Defendant has acknowledged there is a black-market for leopard skins in Nigeria, where the pelts sell for the equivalent of fifty U.S. dollars, that could be used to fill demand for religious purposes. (Garlick Investigative Report at 5.) Wildlife smuggling is prevalent in Nigeria because the border controls are lax and corruption in the country is endemic, despite the fact that Nigerian laws protect leopards. (Hunter Decl. at ¶ 6.) In any event, Defendant's argument fails to rebut the overall impact that a new religious exemption would have upon the leopard population. As discussed above, the Government has adequately demonstrated that the negative impact of a religious exemption extends beyond its use by those with sincere religious needs for leopard pelts, given enforcement difficulties and wildlife smuggling incentives.

15

1  Second, Defendant argues that the evidence submitted by the Government itself indicates
2  that leopard populations have proven to be remarkably resilient to stresses on its population, and that
3  permitting a religious exception would therefore not have a significant detrimental effect on the
4  endangered leopards in northern Africa. The Court finds that this is not a reasonable conclusion that
5  can be drawn from the evidence discussed above. However resilient the leopard may have proven to
6  be, the cumulative import of the evidence in the record leads this Court to conclude that the northern
7  African leopard is on the brink of extinction and that a religious exemption will only serve to assist
8  in the hurried extinction of the leopards for multiple reasons.

9  Finally, citing the Supreme Court's decision in *Gonzales v. O Centro Espiritu Beneficiente*
10 *Uniao de Vegetal*, 546 U.S. 418 (2005) ("*UDV*"), Defendant argues that the Government's showing
11 as to both the "compelling interest" and "least restrictive means" elements is insufficient, because it
12 fails to explain how its asserted interests would be harmed by granting a religious exemption that
13 Mr. Adeyemo could invoke.[11] In *UDV,* the government claimed a compelling interest but supported
14 it solely through the existence of laws and regulations enacted to further the interest. *See id.* at 438.
15 The *UDV* Court held that the government failed to demonstrate how granting the requested religious
16 accommodation to 120 adherents in need of a controlled substance would seriously compromise the
17 government's ability to enforce the Controlled Substance Act. *See id.* at 439. As the Court
18 explained, "RFRA requires the Government to demonstrate that the compelling interest test is
19 satisfied through application of the challenged law 'to the person'- the particular claimant whose
20 sincere exercise of religion is being substantially burdened." *Id.* at 430-31. A reviewing court must
21 therefore "scrutinize [] the asserted harm of granting specific exemptions to particular religious
22 claimants." *Id.* at 431.

23 The Court finds that, contrary to Defendant's assertion, the Government's evidentiary
24 showing relating to the protection and conservation of leopards does not suffer from the same

---

[11] To the extent that Defendant is proposing that the Court must analyze the effect of a religious exemption as if it would apply only to Defendant himself and not to any other Santeria adherent, the Court rejects Defendant's proposal as inconsistent with RFRA and the strict scrutiny test it adopted. *See UDV*, 546 U.S. at 430-31. The practice of the Santeria religion is not restricted to a very few individuals; this Court must therefore consider the overall impact that a religious exemption available to Defendant and all similarly-situated Santeria adherents would have. *See, e.g., Lundquist*, 932 F. Supp. at 1242.

16

deficiencies found in *UDV*. Unlike in *UDV*, here the Government has not premised its purported compelling interest merely on the need to enforce a statutory scheme as written. Instead, the Government has specifically shown how its interests would be harmed by granting a religious exception to the laws under which Defendant has been charged, even if that religious exemption only extended to adherents of the Santeria religion. The Government's showing takes "relevant differences" into account and presents a particularized showing of the practical and real-world effects that granting a religious exception to Santeria adherents would have on the survival of an endangered species.

## CONCLUSION

For the foregoing reasons, the Court finds that the Government has met its burden under RFRA of demonstrating that the current permitting system for leopard skins, which includes no religious exemption, is the least restrictive means of furthering its compelling interest of conserving and protecting the endangered northern African leopard. Accordingly, the Court need not hold an evidentiary hearing as to whether Defendant's initial burden has been met, because dismissal of the indictment would be unavailable to Defendant under RFRA in any event. The Court **DENIES** Defendant's motion to dismiss.

**IT IS SO ORDERED.**

Dated: April 3, 2008

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE